UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
UNITED STATES OF AMERICA, :
:
-v- : 18-CR-783 (JMF)
:
DAMON BIGNON, : OPINION AND ORDER
:
Defendant. :
:
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Defendant Damon Bignon is charged with one count of being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g). That charge arises from a search of Bignon's backpack by officers from the New York City Police Department ("NYPD") following his arrest for unlawful possession of marijuana. Bignon now moves to suppress the firearm on the ground that it was obtained in violation of his rights under the Fourth Amendment. *See* Docket No. 10. He argues that the police lacked probable cause to arrest him and, in the alternative, that the search of his backpack was an unlawful inventory search. *See* Docket No. 11 ("Def. Mem."). For the reasons stated below, Bignon's motion is DENIED.

## BACKGROUND

Bignon is charged in a one-count indictment with possessing a firearm having previously been convicted of a felony after a police officer's search of his backpack revealed that he was carrying a gun. On December 3, 2018, he moved to suppress the evidence seized as a result of the search — including the gun — on the ground that it was obtained in violation of the Fourth Amendment. *See* Docket No. 10. The Government opposed Bignon's motion, but — in light of an affidavit submitted by Bignon — conceded the need for an evidentiary hearing. *See* Docket

No. 15 ("Gov't Mem."), at 2. Accordingly, on February 5, 2019, the Court held a hearing at which the Government called as a witness NYPD Officer Kevin Seward, and Bignon called as a witness NYPD Officer Zachary Lavender. *See* Feb. 5, 2019 Hearing Tr. ("Tr.") 3, 116-17. In addition, the Court admitted various exhibits, including videotaped footage from body cameras worn by four of the NYPD officers involved in the incident. *See id.* at 47-49; Docket No. 13, Exh. C.[1] The Court finds that the officers testified credibly and, based on their testimony and the exhibits admitted into evidence, makes the following findings of fact.

At about 2:50 p.m. on September 27, 2018, Officer Seward, Officer Lavender, and three other NYPD officers were driving northbound on the Grand Concourse in the Bronx in a marked police van conducting routine enforcement in the 44th Precinct, a relatively high-crime area. *See id.* at 5-6, 12-14, 18, 105. Officer Seward, prompted by another officer, looked out the window and observed Bignon, "huddled up against the wall" of a building, "with smoke coming from his mouth, smoking." *Id.* at 21. Officer Seward — who has participated in more than two hundred "enforcements" (that is, encounters resulting in either an arrest or the issuance of a summons) for public smoking of marijuana — suspected that Bignon was smoking marijuana based on the color and nature of the smoke and the fact that Bignon was holding the cigarette or joint "with his thumb and pointer finger." *Id.* at 7-8, 21-23; *see also id.* at 9-10 (testifying, based on his experience, that "the smoke from a cigarette" is "whiter and more thick than the smoke of a [marijuana] joint" and that "people tend to hold [a marijuana joint] with their thumb and their pointer finger" and "a cigarette, usually with their pointer finger and their middle finger").

---

[1] The body camera footage was admitted at the hearing as Government Exhibit 1. *See* Tr. 47-49. It was also submitted to the Court as Exhibit C to Docket No. 13, but it is not available through the public docket. "Exh. C.1" refers to the footage from Officer Seward's body camera; and "Exh. C.2" refers to the footage from another officer's body camera.

2

Officer Seward and three other officers got out of the van and began to approach Bignon. *Id.* at 26-27. At that point, Bignon made eye contact with Officer Seward, dropped whatever he had been smoking, and began walking away from the officers. *Id.* at 27, 29; *see also* Exh. C.1, at 3:30-3:34; Exh. C.2, at 2:55-3:05 (Bignon later explaining why he dropped the cigarette when the police approached him). As Officer Seward approached Bignon, he "smelled a slight odor of weed in the air." Tr. 28. Officer Seward caught up with Bignon and he asked him "where is it," to which Bignon responded, "It's just a joint, see?" *Id.* at 29; *see also id.* at 50-52, 111-12; *see also, e.g.*, Exh. C.1, at 3:20-3:25, 3:39-3:42 (Bignon repeatedly referring to the cigarette as a "hemp joint"). Officer Seward — who testified that, in his experience, the word "joint" refers to a marijuana cigarette and that he had never heard of someone using the word to refer to a tobacco cigarette, *see id.* at 9, 11 — understood Bignon to be admitting that he had been smoking marijuana. *See id.* at 29-30, 50. Officer Seward testified that, based on Bignon's statement and what he had observed, he was "confident" that Bignon had been smoking marijuana. *Id.* at 57; *see also id.* at 52. Officer Seward recovered the joint from the ground, after which another officer asked Bignon for his name and identification. *See id.* at 30-31. Bignon refused to provide either, and the officers arrested him. *See id.* at 31, 34-36, 38. On the way to, and at, the 44th Precinct, the officers repeatedly assured Bignon that they were going to give him a ticket and release him. *See* Exh. C.1, at 10:05-10:12, 14:10-14:13, 14:45-14:50; *see also* Tr. 38-39.

When they arrived at the 44th Precinct, the officers brought Bignon to the front desk. *See* Tr. 38. There, Officer Seward placed the joint he had recovered (and a couple other items taken from Bignon) into an NYPD property envelope. *See* Exh. C.1, at 7:45-8:05; Tr. 39-40. Bignon then gave his name and date of birth for the first time and, in a search of his person, officers found photo identification. *See* Tr. 38; *see also* Exh. C.1, at 11:35-40. Officer Seward also

3

found $345 in cash on Bignon, which he counted out loud in a manner designed to be captured on his body camera; he advised Bignon that they were going to "hold onto" the money "for now," until they "cut [him] loose." *See* Exh. C.1, at 11:35-13:20. Officer Seward and Officer Lavender then escorted Bignon to cell area of the Precinct, explaining that they were going to write him a summons and then release him. *See* Tr. 39-40; Exh. C.1, at 14:07-54. Before they placed Bignon in the cell, Officer Seward and Officer Lavender frisked him again; removed his belt and shoelaces, placing them in an NYPD property envelope; and took custody of a backpack that Bignon had been carrying at the time of his arrest. *See* Tr. 39-41; Exh. C.1, at 14:18-17:30. Officer Seward proceeded "back to the office area," where he and Officer Lavender conducted an "inventory search" of the backpack and found a black handgun, a magazine, and bullets. *See id.* at 41, 46.

Officer Seward testified that, in his experience, it is "standard practice at the 44th Precinct to put any arrestee who's been brought back to the precinct into a cell" and that he had never seen someone arrested and brought back to the precinct not put into a cell. Tr. 42, 95; *see id.* at 54-55. He explained that that is the practice even if an officer plans is to issue a summons because the officer has to verify the arrestee's pedigree information, check the computer system for active warrants, and write the summons. *Id.* at 90-91. More relevant for present purposes, Officer Seward testified that, in his experience, when someone is put into a cell at the 44th Precinct, that person's belongings are "always searched" and that he had never seen the belongings of someone put into a cell at the 44th Precinct not searched. *Id.* at 42-43; *see id.* at 55. Officer Seward explained that such searches are "for the safety of the people who are inside the precinct, and you have to count their property in case of any accusations later on of lost property." *Id.* at 43; *see id.* at 55. He explained that if the arrestee is not released with a

4

summons, his or her property would be "placed in a property bag and the property would get vouchered." *Id.* at 109-10. By contrast, when an arrestee is released with a summons, he "would typically just give" the property "back to them, not document it." *Id.* at 104; *see id.* at 107.

On October 23, 2018, the NYPD Police Laboratory performed a controlled substance analysis on the cigarette that Officer Seward recovered from the ground near Bignon. *See* Docket No. 13-3. It tested positive for cocaine, but negative for marijuana. *See id.*; *see also* Tr. 57. There is no indication that the Laboratory tested the cigarette for hemp, but, based on Bignon's repeated assertions that that was what he was smoking, the Court finds that the primary ingredient in the cigarette was hemp. *See, e.g.*, Exh. C.1, at 3:20-3:25, 3:39-3:42. Notably, it is well established that hemp and marijuana are "varieties of the same species, *Cannabis sativa L.*" Gero Leson et al., *Evaluating the Impact of Hemp Food Consumption on Workplace Drug Tests*, 25 J. of Analytical Toxicology 691, 692 (Nov./Dec. 2001); *accord The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research*, National Academies of Sciences, Engineering, and Medicine, at * 38 & n.6 (2017), *available at* https://doi.org/10.17226/24625. The primary difference is that marijuana has a higher concentration of the psychoactive compound cannabinoid delta 9 tetrahydrocannabinol, more commonly known as THC. *See Evaluating the Impact of Hemp Food Consumption*, at 692; *see also* Agricultural Improvement Act of 2018, Pub. L. No. 115-334, § 12619, 132 Stat. 4490, 5018 ("The term 'hemp' means the plant Cannabis sativa L. and any part of that plant . . . . with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."). Thus, it is fair to infer, and on that basis the Court finds, that the odor of burning

marijuana and the odor of burning hemp are similar — or, more to the point, that one could reasonably mistake one odor for the other.[2]

## DISCUSSION

Bignon argues that his Fourth Amendment rights were violated in two independent ways. First, he contends that the search of his backpack was unlawful because the arrest that preceded it was unlawful. Second, he argues that the search was unconstitutional on its own terms because it did not fall within the inventory search exception to the warrant requirement. The Court will address each argument in turn.

### A. Bignon's Arrest Was Supported by Probable Cause

Bignon moves to suppress, first, on the ground that his arrest was unlawful. It is well established that a lawful arrest requires probable cause. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 177 (2008). Probable cause "exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). Probable cause "is a fluid concept," *Florida v. Harris*, 568 U.S. 237, 244 (2013) (internal quotation marks omitted), which is "not readily, or even usefully, reduced to a neat set of legal rules," *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (internal quotation marks omitted). It is well established, however,

---

[2] To be clear, the Court does not take judicial notice that the odors of marijuana and hemp are similar. The Government cited two law review articles and a Ninth Circuit case for that proposition, *see* Gov't Mem. 8, but offered no evidence to support it and conceded that it is not something of which the Court could take judicial notice, *see* Tr. 155. Instead, the Court takes judicial notice of the indisputable fact that marijuana and hemp are varieties of the same species, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 11 (1993) (noting that a court may take notice of well-established scientific facts); *accord Moyer v. IBM Corp.*, No. 02-CIV-8894 (GEL), 2003 WL 256931, at *2 (S.D.N.Y. Feb. 3, 2003), and *infers* from that fact that one could reasonably mistake the odor of one burning for the odor of the other burning.

that "[p]robable cause is to be assessed on an objective basis," *Zellner*, 494 F.3d at 369, "based on the totality of the circumstances," *see United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007). Thus, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see Whren v. United States*, 517 U.S. 806, 812-13 (1996) (reviewing cases). Put differently, "an arrest is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime." *Zellner*, 494 F.3d at 369.

Applying those standards here, the Court concludes that there was probable cause to arrest Bignon for unlawful possession of marijuana, in violation of New York Penal Law § 221.05.[3] First, Officer Seward observed Bignon holding the cigarette in a manner that is commonly associated with a marijuana joint. *See, e.g.*, *United States v. Brown*, 621 F.3d 48, 56 (1st Cir. 2010) (holding that the district court properly found that police had reasonable suspicion because they saw the defendant "smoking a small cigar in the distinctive manner that marijuana is smoked: holding one's breath after taking a drag from the blunt that was being held between the forefinger and thumb"); *accord United States v. Coates*, 457 F. Supp. 2d 563, 568 (W.D. Pa. 2006). Second, Bignon threw the cigarette away when he saw the police officers approaching him. *See, e.g.*, *United States v. Munoz*, 987 F. Supp. 2d 438, 443 (S.D.N.Y. 2013) (holding that an officer's observation of the defendant and another individual "throw[ing] objects that looked

---

[3] As discussed below, the parties' dispute whether Bignon's arrest was consistent with the NYPD's policies regarding marijuana possession. But whether it was or not is irrelevant to the question of whether there was probable cause for the arrest for purposes of the Fourth Amendment. *See, e.g.*, *Moore*, 553 U.S. at 176 ("[W]hile States are free to regulate [warrantless] arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").

7

like marijuana cigarettes from their mouths to the vehicle floor . . . provided [the officer] with reasonable suspicion to believe that the occupants were engaged in criminal activity"); *see generally Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that "unprovoked flight upon noticing the police" and "nervous, evasive behavior" are pertinent factors in determining reasonable suspicion). Third, Officer Seward reasonably believed that he detected an odor of marijuana. *See, e.g.*, *United States v. $12,718 in U.S. Funds*, No. 04-CV-175, 2006 WL 8431715, at *3 (D. Vt. Sept. 1, 2006) ("In general, the smell of marijuana alone is sufficient to give rise to probable cause."); *see also, e.g.*, *United States v. Jackson*, 652 F.2d 244, 251 n.6 (2d Cir. 1981) ("Probable cause can be established by a . . . suspicious smell."). And fourth, Bignon himself described the cigarette as a "joint" or "clip," terms that are commonly used in reference to marijuana, not tobacco. *See, e.g.*, *United States v. Fury*, 554 F.2d 522, 531 (2d Cir. 1977) (finding probable cause based on "somewhat ambiguous" statements that could be "reasonably interpreted to indicate what the detective interpreted them to be"). Taken together, these facts and circumstances were sufficient to establish probable cause to justify Bignon's arrest.

It is true, of course, that Bignon's cigarette did not actually contain marijuana. At most, however, that fact calls into question the reasonableness of Officer Seward's belief that he had smelled marijuana. But Officer Seward could have reasonably, but mistakenly, believed that he smelled marijuana given the close similarity, discussed above, of marijuana and hemp (or, for that matter, for any number of reasons, including the possibility that someone else had been smoking it in the vicinity).[4] And even without Officer Seward's testimony that he detected a

---

[4] In a declaration, Bignon stated that there was "no odor of marijuana" near him. *See* Docket No. 12, ¶ 2. Insofar as odor is in the nose of the beholder, that statement does not undermine Officer Seward's perception that there was an odor of marijuana in the area. In fact, it is possible to credit both accounts because the police officers' body cameras show that Bignon

8

"slight odor" of marijuana "in the air," the remaining facts would be enough for a person of reasonable caution to conclude that Bignon was unlawfully smoking marijuana. More broadly, the mere fact that the officers were ultimately "mistaken" does not undermine the Court's finding that they had probable cause. *United States v. Gagnon*, 373 F.3d 230, 239 (2d Cir. 2004); *see, e.g.*, *Mastromonaco v. Cty. of Westchester*, No. 15-CV-10166, 2018 WL 4042111, at *6 (S.D.N.Y. Aug. 23, 2018) ("[E]ven if [the police officer] was mistaken regarding the marijuana odor emanating from plaintiff's vehicle, that would not undermine the Court's finding he had probable cause."); *see generally United States v. Jenkins*, 452 F.3d 207, 212 (2d Cir. 2006) ("The constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts.").

**B. The Search Fell Within the Inventory Search Exception to the Warrant Requirement**

Bignon's alternative argument, that the search of his backpack was an unlawful inventory search, presents a closer question, but it too ultimately falls short. An "'inventory search constitutes a well-defined exception to the warrant requirement' under the Fourth Amendment." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008) (internal quotation marks omitted). Inventory searches "are deemed reasonable under the Fourth Amendment because [they] serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (internal quotation marks omitted). Pursuant to the exception, "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria or established routine." *United*

---

repeatedly said that his cigarette contained hemp, *see, e.g.*, Exh. C.1, at 3:37-3:41; Exh. C.2, at 3:10-3:15, and, for the reasons explained above, it is reasonable to infer that the smell of burning hemp and the smell of burning marijuana are easily confused.

*States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (internal quotation marks and alteration omitted). "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." *Id.* (internal quotation marks omitted). The procedure "may allow the searching officers sufficient discretion in deciding whether or not to open a specific container," but it "must not be a pretext for a general rummaging in order to discover incriminating evidence." *Thompson*, 29 F.3d at 65-66; *accord Mendez*, 315 F.3d at 137.

Applying those standards here, the Court concludes that the search of Bignon's backpack did not run afoul of the Fourth Amendment. NYPD Patrol Guide Procedure No. 218-13 — of which the Court can and does take judicial notice, *see Williams v. City of New York*, 121 F. Supp. 3d 354, 369 n.16 (S.D.N.Y. 2015) — states that property that is possessed under the control of an arrested individual "'*may be* inventoried,'" and the word "may" suggests that "an inventory search is discretionary." *See United States v. Cancel*, 167 F. Supp. 3d 584, 596 n.9 (S.D.N.Y. 2016) (quoting NYPD Patrol Guide Procedure No. 218-13).[5] But Officer Seward testified credibly that — "for the safety of the people inside the precinct, and . . . in case of any accusations later . . . of lost property," Tr. 43 — it is his standard practice and standard procedure in the 44th Precinct to search the property of any arrestee placed into a cell. *See id.* at 42-43, 54-

---

[5] The Government writes that "the NYPD Patrol Guide clearly states that '[w]henever any property comes into the custody of this Department an inventory search *will* be conducted . . . .' NYPD Patrol Guide Procedure No. 218-13 (emphasis added)." Gov't Mem. 13; *see also* Docket No. 20 (quoting the same language). This is misleading. The Patrol Guide actually states that "[w]henever any property comes into the custody of this Department an inventory search will be conducted *as follows* . . . ," and then describes when and how officers may search automobiles. NYPD Patrol Guide Procedure No. 218-13 (emphasis added). Thus, the broad prefatory language is limited by what "follows." Moreover, the procedure for searches of property other than automobiles appears a page later and begins with the following sentence: "Any closed container *may be* opened and its contents inventoried." *Id.* (emphasis added).

10

56, 90. And there is no evidence that Officers Seward and Lavender "acted in bad faith or for the sole purpose of investigation." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *see Lopez*, 547 F.3d at 372 ("[T]he expectation and motivation to find criminal evidence do not constitute bad faith."). This testimony is sufficient to establish that Officers Seward and Lavender searched Bignon's backpack pursuant to a valid NYPD procedure. *See Mendez*, 315 F.3d at 137; *Cancel*, 167 F. Supp. at 596 & n.9; *United States v. Morillo*, No. 08-CR-676, 2009 WL 3254431, at *11 (E.D.N.Y. Oct. 9, 2009) (upholding an inventory search based on credible testimony from an NYPD officer "that his practice is to conduct an inventory search before returning property . . . notwithstanding any discretionary language in the Inventory Search Guidelines").

In arguing otherwise, Bignon contends that "there was no apparent need to inventory the backpack's contents based on the officers' stated intent to release Mr. Bignon with a summons." Def. Mem. 7. As the Sixth Circuit has explained, however, that contention "misses the point. The rationale of [the inventory search exception] focuses upon protection of both the arrestee and police during the period a suspect is detained at the station house." *United States v. McCroy*, 102 F.3d 239, 241 (6th Cir. 1996). Absent changed circumstances, Officer Seward's intention was to release Bignon with a summons. *See* Tr. 92. But at the time of the search, Bignon was in a jail cell pending Officer Seward's search of the "police computer system to see if he had any active warrants, to verify his pedigree information" (and Bignon's unavailing argument about probable cause aside, he does not contend that that temporary detention ran afoul of the Fourth Amendment). *Id*. at 91. "Thus, at the time of the inventory search it was by no means certain that defendant would be released with a citation. Under these circumstances, an inventory search represents the type of 'entirely reasonable administrative procedure' contemplated by [the inventory search exception]." *McCroy*, 102 F.3d at 241.

Citing the Supreme Court's admonition that "[t]he policy or practice governing inventory searches should be designed to produce an inventory," *Florida v. Wells*, 495 U.S. 1, 4 (1990), Bignon also contends that the search here violated the Fourth Amendment because Officer Seward did not make a contemporaneous record of the backpack's contents and admitted that he might not have made any record had the search not revealed evidence of a crime. *See* Docket No. 19, at 1-3 (citing Tr. 59, 103-04). Officer Seward's practices on that score undoubtedly stretch the inventory search exception closer to its breaking point. *See, e.g.*, Tr. 59, 65-66. But the Court does not understand his testimony to mean that his search was not designed to produce an inventory altogether. Instead, when considered in conjunction with the body camera footage showing Officer Seward counting and recording the amount of money taken from Bignon, *see, e.g.*, Exh. C.1, at 11:30-13:30, the Court construes his practices to involve documenting anything of value taken into police custody and creating a written inventory if evidence of a crime is found (as happened here). *See* Tr. 63, 107, 109. Those practices are sufficiently tethered to the purposes underlying the inventory search exception — to "deter theft by and false claims against [the police] and preserve the security of the stationhouse," *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) — to satisfy the Fourth Amendment. *See Lopez*, 547 F.3d at 371 (rejecting the argument that "the failure to itemize each object found" during an inventory search was "incompatible with the Supreme Court's warning that inventory searches should be designed to produce an inventory" and holding that a uniform policy "as to whether insignificant items of little or no value must be explicitly itemized" is not required (internal quotation marks omitted)).

Finally, at the close of the evidentiary hearing, Bignon's counsel suggested that the inventory search here was unlawful because Bignon's arrest and detention in the jail cell violated NYPD policy — most prominently, a recently adopted policy with respect to the handling of

those smoking marijuana in public. *See* Tr. 157-58 ("[I]f they're making an arrest in violation of NYPD policy, they can't then make an inventory search because that inventory search wouldn't actually be authorized under the police department's policy"); *see* Tr. 140-42 (questioning Officer Seward with respect to whether the arrest of Bignon was consistent with the recently adopted policy). That policy states that "certain qualified violators . . . may be charged with Unlawful Possession of Marijuana and issued a Criminal Court summons in lieu of arrest." NYPD Patrol Guide Procedure No. 209-38 (admitted as GX-3). The Court is not convinced, however, that Bignon's arrest ran afoul of this policy because a "[d]isqualifying factor[]" is that the "[p]erson is not properly identified," *id.*, and Bignon refused to provide his name or identification when initially confronted on the street, *see* Tr. 31.

But even assuming *arguendo* that Bignon's arrest *was* a violation of NYPD policy, it does not follow that the search of his backpack was a violation of the Fourth Amendment. The inventory search exception depends on the existence of an established policy or procedure and, to that extent, involves "a special incorporation of state law into Fourth Amendment jurisprudence." *United States v. Gonzales*, 535 F.3d 1174, 1183 (10th Cir. 2008) (internal quotation marks omitted). But Bignon fails to cite, and the Court has not found, any authority for the proposition that a search conducted in accordance with a valid inventory search policy is rendered unconstitutional because the arrest preceding the search, although supported by probable cause, did not accord with a state policy.[6] And at least one district court in this Circuit

---

[6]   The closest authority the Court has found is *United States v. Mills*, 472 F.2d 1231, 1239-40 (D.C. Cir. 1972) (en banc), in which the D.C. Circuit held that an inventory search was improper because, in violation of state law, the defendant had not been told of his right to avoid detention by posting collateral. But the "continued vitality" of *Mills* and similar decisions is "subject to some doubt" in light of more recent Supreme Court precedent, including *Moore*, 553 U.S. at 176, and *Whren*, 517 U.S. at 815. *See* WAYNE LAFAVE ET AL., SEARCH & SEIZURE

13

has rejected such an argument. *See United States v. Miller*, 382 F. Supp. 2d 350 (N.D.N.Y. 2005). In that case, the defendant was arrested following a routine traffic stop by an officer from the Watervliet Police Department based on an outstanding warrant from Troy, New York; during an inventory search of his car, the police found a gun, ammunition, drugs, and other contraband. *See id.* at 356-58. The defendant moved to suppress that evidence, arguing that the police did not have "legitimate custody" of his car because his arrest was made in violation of a Watervliet Police Department policy allowing an arrest based on an out-of-jurisdiction warrant only if the arresting officer has first confirmed with the jurisdiction that it is still seeking the suspect. *See id.* at 357, 368-69, 377. The Court soundly rejected that argument: "[E]ven if Watervliet policy requires confirmation, that policy cannot alter the Fourth Amendment's probable cause analysis federally. There may be various reasons for such a policy, including a department's reluctance to effectuate a custodial arrest only to have the 'wanting agency' refuse pick-up. Such pragmatic concerns are no part of the probable cause equation." *Id.* at 369. The validity of the arrest and seizure of the car turned solely on whether there was probable cause for the arrest, and the officer's failure to comply with the Watervliet policy had no bearing on the propriety of the ensuing inventory search. *See id.* at 377.

The Court concurs with that approach. The inventory search exception does depend on a showing that the police had "legitimate custody of the property to be inventoried, either as a result of lawful arrest or by some other method." *United States v. Jenkins*, 876 F.2d 1085, 1089 (2d Cir. 1989) (citations omitted); *accord Mendez*, 315 F.3d at 138. But here, as in the search-incident-to-lawful-arrest context, courts have "equated a lawful arrest with an arrest based on

---

§ 5.3(d) (Oct. 2018 update). And in any event, suppression under *Mills* "is a possibility only if, at the very time of the search, the defendant was *entitled* to release." *Id.* (emphasis added). Here, there is no suggestion that Bignon was *entitled* to release under state or federal law.

14

probable cause." *Moore*, 553 U.S. at 177; *see, e.g.*, *Thompson*, 29 F.3d at 65 (rejecting a defendant's challenge to his arrest on the ground that it was "pretext for conducting an inventory search," explaining that "whether the stop was pretextual or not . . . is irrelevant to determining the arrest's validity," and then proceeding to address the validity of the ensuing inventory search separately); *United States v. White*, 298 F. Supp. 3d 451, 457-59 (E.D.N.Y. 2018) (finding that the police had "legitimate custody" of the defendant's backpack because he had been "lawfully arrested" — that is, the police "had probable cause to arrest" him). That is for good reason. The probable cause requirement, in and of itself, provides adequate protection against unreasonable searches and seizures of the person and, by extension, any property accompanying the person. *See Moore*, 553 U.S. at 173-76. And so long as that requirement is met, "[t]he interests justifying" an otherwise proper inventory search "are present whenever an officer makes an arrest," without regard for whether the arrest is consistent with state policy or not. *Id.* at 177; *see id.* ("The state officers *arrested* Moore, and therefore faced all the risks that are an adequate basis for treating all custodial arrests alike for purposes of search justification." (internal quotation marks omitted)).

In short, an otherwise proper inventory search is not rendered unconstitutional because the arrest or detention that preceded it, while supported by probable cause, violated a state or local policy.[7] Because Bignon's arrest was supported by probable cause, the search of his

---

[7] In a conference held on February 11, 2019, Bignon argued that his temporary detention in a jail cell also ran afoul of NYPD Patrol Guide Procedure Nos. 208-02 and 208-05, which concern the processing of arrests. Even if this were true, the argument would fall short for the same reasons: a violation of NYPD policy with respect to arrest and detention does not vitiate the lawfulness of an otherwise proper inventory search. At most, the officers' alleged violations of NYPD policies with respect to arrest and detention could be relevant to whether an inventory search was pretextual. But the Second Circuit's decision in *Thompson*, 29 F.3d at 65, suggests that they may not be considered even for that purpose. And, in any event, there is no basis here to find that the inventory search was pretextual or conducted in bad faith.

15

backpack was conducted in accordance with standardized criteria or established routine, and there is no evidence that Officers Seward and Lavender acted in bad faith, the search was proper under the inventory search exception and thus consistent with the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the Court concludes that the search in this case did not violate Bignon's Fourth Amendment rights. Accordingly, his motion to suppress is DENIED. The Clerk of Court is directed to terminate Docket No. 10.[8]

SO ORDERED.

Date: February 15, 2019
New York, New York

JESSE M. FURMAN
United States District Judge

---

[8] With this decision, the Speedy Trial Act clock begins running again. *See* 18 U.S.C. § 3161(h)(1)(D) (excluding from the speedy trial clock "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"). Counsel should promptly confer with respect to whether time should be excluded or the trial date should advanced. No later than **February 22, 2019**, the Government should submit a letter indicating the parties' positions on that question and, if appropriate, submitting a proposed order excluding time.